MATTHEW SCHINDLER, OSB# 964190
501 Fourth Street #324
Lake Oswego, OR 97034
Phone: (503) 699-7333
FAX: (503) 345-9372
e-mail: mattschindler@comcast.net

ATTORNEY FOR DEFENDANT MICHAEL BOWMAN

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | Case No. 3:17-CR-00068-MO |
| vs. | **MOTION TO DISMISS - VIOLATION OF 42 USC § 2000bb-1 (THE RELIGIOUS FREEDOM RESTORATION ACT)** |
| MICHAEL BOWMAN,<br>Defendant(s). | |

Defendant, Michael Bowman, through his attorney, Matthew Schindler, moves the Court to dismiss the indictment alleging violations of 26 USC §§ 7201 and 7203 because, as applied to him, these criminal charges violate his right to maintain his conscience and freely practice his religion as guaranteed by the First Amendment to the United States Constitution and 42 USC § 2000bb-1 (The Religious Freedom Restoration Act "RFRA"). This motion is further supported by the following Memorandum of Law.

//

## MEMORANDUM OF LAW

### 1. Relevant Facts:[1]

Michael Bowman was raised a Catholic but his religion is based on the teachings of Jesus Christ. He is a Christian who has forged his spiritual identity based on the Holy Bible. He also believes that you cannot serve two masters, and that "we must obey God rather than men." Acts 5:29. His core spiritual values are easily understood. He is compassionate and respectful of others. Human life is sacred and worthy of protection. He is deeply committed to the right of the individual to spiritual self-determination free from government interference and threats of violence. He believes that he must treat others the way he would want to be treated. Someday, Mr. Bowman knows, he will be judged for the way he conducted his life. That foresight guides him. It is his religion, his moral code, his belief system, and his right to freely exercise his religion guaranteed him by the Constitution and the RFRA.

Fundamental to Mr. Bowman's Christianity is that life is sacred from the moment it is conceived. He therefore commits to living every minute true to the core value that all life is precious, and none is more precious than the life belonging to the voiceless unborn child. To voluntarily support

---

[1] This statement of facts is based on Mr. Bowman's Declaration filed in support of this Motion.

abortion, is a breach of conscience and a direct conflict with his values, and practice of his religion. His right to pursue these basic values is assured him by the Constitution and yet he knows that by being forced to pay for abortion it destroys his countenance before God. For him to acquiesce would represent a complete abandonment of his principles and his conscience. Mr. Bowman has always believed that "You cannot serve two masters." Matthew 6:24. *See Declaration of Michael Bowman attached.*

When Mr. Bowman began to work, he understood that he was expected to pay taxes. So he paid. From the very beginning, Mr. Bowman was concerned about the spiritual implications of the tax system. Forced acts of self-assessment and swearing an oath to the government affirming the contents of his returns troubled him. They were inconsistent with his faith.

His reluctant participation ended when Mr. Bowman learned of the federal government's use of tax dollars to support organizations that had killed tens of millions of unborn children in direct contravention of his religion and his core spiritual values.  That realization caused an existential crisis. For years, the government had been murdering babies in violations of his rights and he had been unwittingly forced to support it. He could not, consistent with the practice of his religion and his core values, continue to participate in a tax system where the government made him to communicate

his support for this profoundly immoral conduct. Through his tax payments he was forced to support abortion which had nothing to do with the governance of the United States. This deeply impacted his free exercise of his religion.

Mr. Bowman's fear has always been that the logic supporting the government's promotion of abortion was just the first step in an increasing set of atrocities he would be forced to support in violation of his religion. Mr. Bowman cannot escape the omnipresent fear that if the government can use the money it demanded he pay to support the murder of unborn American children, there was no conduct it could not make him pay for. Nazism and Fascism are the logical end point. It is a world where no one is free to practice their religion. He envisions a place where the government could force all kinds of conduct irrelevant to governance on him and anyone else no matter how deeply it contravenes essential human values or their religion. That reality runs on an endless loop for Michael Bowman.

If it were only that living nightmare, perhaps Mr. Bowman could have found a way out. But this is too personal and too critical to how his soul will be judged for eternity. And so Mr. Bowman has not paid, and will not pay, until his core values and right to practice religion are accommodated as they must be under 42 USC § 2000bb-1.

Mr. Bowman desperately wishes he could just pay. He respects that taxation is critical to the functioning of the government. The government cannot protect us and perform its necessary functions without money. Those functions have nothing to with forcing him to promote the destruction of his faith through abortion. The consequence of the government's unlawful failure to accommodate him and his refusal to sacrifice his conscience has been financial ruin. But even that is not enough for the government. Now its unlawful refusal to accommodate his religion in any way has resulted in this same government terrorizing him with criminal charges and the threat of going to prison. He wants to pay taxes but until the government stops murdering babies with his income taxes, he cannot pay.

The very moment, the instant, that his money is no longer being used to promote murder, he will gladly pay every cent he owes to the government. He has told the government repeatedly, to the point of filming it and sending it to the IRS, that as soon as the government gets out of the business of using his money to destroy his ability to practice his religion, he will file returns and attempt to pay. That is what makes these charges, so many years after he first took this stand, absurd. Mr. Bowman has never evaded anything or anyone. He has always been completely honest when he discussed his

religion with government agents over the last twenty years. All he wanted was a remedy, a remedy that should have been provided under the RFRA.

**2. Being criminally prosecuted for refusing to pay income taxes in this case violates the RFRA and Mr. Bowman's right to freely practice his religion.**

There are no cases under the RFRA that address Mr. Bowman's free exercise claims relating to the government's use of taxpayer funds to promote abortion. The cases that the government has traditionally relied upon to argue that religious objections are not a basis to refuse to pay taxes are inapposite or have been superseded by amendments to the RFRA. There are several critical distinctions between Mr. Bowman's case and the others that have challenged income taxation before.

**a.** *United States v. Lee***, 455 U.S. 252 (1982) is inapposite and has been preempted by the RFRA.**

In uniformly rejecting requests for any religious accommodation relating to taxes, the government relies on *United States v. Lee*, 455 U.S. 252, 261 (1982). In *Lee,* the Court denied an Amish request to be exempted from Social Security taxes. *Id.* The Court accepted that the taxes "interfered with" the Amish's free exercise rights. *Lee*, 455 U.S. at 257. Comparing it to the government's interest in collecting taxes for the national defense, the Court held that the requirement to pay Social Security taxes was sufficiently compelling to overcome the Amish's right to freely practice their religion. *United States v. Lee*, 455 U.S. 252, 260 (1982). It further found there was no way that the Amish could be accommodated:

Page 6 – MOTION TO DIMISS - VIOLATION OF 42 USC § 2000bb-1 (THE RELIGIOUS FREEDOM RESTORATION ACT)

> The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief. *See, e.g.*, *Lull v. Commissioner*, 602 F.2d 1166 (CA4 1979), cert. denied, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 643 (1980); *Autenrieth v. Cullen*, 418 F.2d 586 (CA9 1969), cert. denied, 397 U.S. 1036, 90 S.Ct. 1353, 25 L.Ed.2d 647 (1970). Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax.
>
> *United States v. Lee*, 455 U.S. 252, 260, 102 S. Ct. 1051, 1056–57, 71 L. Ed. 2d 127 (1982).

This quoted passage has always been at the core of the government's failure to accommodate Mr. Bowman free exercise of his religion by using his taxes to support abortion. Other cases since then have relied on *Smith* in dealing with objections to taxes relating to religious objections to war. See, e.g., *Bradley v. United States*, 817 F.2d 1400, 1403 (9th Cir. 1987) ("We have repeatedly approved the assessment of a section 6702 penalty for purported tax returns which claim 'conscience' or 'war tax' deductions."); *Jenney v. United States*, 755 F.2d 1384, 1387 (9th Cir. 1985).

The Supreme Court further limited free exercise objections to facially neutral laws through *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 890 (1990). In *Smith,* Justice Scalia not only rejected the free exercise challenge by Native Americans to the Oregon criminal prohibition on peyote, he repudiated any requirement that the government ever show a compelling interest for a facially neutral law which happened to touch upon

religion. *Id; see also Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2760 (2014); *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997).

Congress refused to accept that result and responded to *Smith* by enacting the RFRA in 1993. "[L]aws [that are] 'neutral' toward religion," Congress found, "may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 USC § 2000bb(a)(2); *see also* § 2000bb(a)(4). *See Hobby Lobby Stores, Inc.,* 134 S. Ct. at 2760.

If the Government substantially burdens a person's exercise of religion, under the RFRA that person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(b). *Id.*

Those amendments to the RFRA as applied to the States were considered in *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997). In *City of Boerne*, the Court held that the RFRA exceeded Congressional powers under Section 5 of the 14th Amendment by requiring a compelling interest and least restrictive means under Section 5. *See id; Hobby Lobby Stores, Inc.,* 134 S. Ct. at 2760.

In response to the decision in *City of Boerne*, Congress passed the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 114 Stat. 803, 42 U.S.C. § 2000cc et seq. RLUIPA was the latest of long-running congressional effort to accord religious exercise heightened protection from

government-imposed burdens, consistent with the Supreme Court's precedents. *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005).

What is most relevant in this context is that the RLUIPA amended RFRA's definition of the "exercise of religion." *See* § 2000bb–2(4); *Hobby Lobby Stores, Inc.,* 134 S. Ct. at 2761. Before RLUIPA, RFRA's definition made reference to the First Amendment. *See* § 2000bb–2(4) (1994 ed.) (defining "exercise of religion" as "the exercise of religion under the First Amendment"); *Id.* The RLUIPA, in an obvious effort by Congress to effect a complete separation from First Amendment case law, deleted the reference to the First Amendment and defined the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A). Congress mandated that this concept "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc–3(g). *Hobby Lobby Stores, Inc.,* 134 S. Ct. at 2761-2762. Finally, Congress applied the amended definition of "exercise of religion" from the RLUIPA to the RFRA. *See Hobby Lobby Stores, Inc.,* 134 S. Ct. at 2762 n.5. Nothing in the RFRA or the RLUIPA exempts income taxes or criminal offenses under Title 26.

The Supreme Court's first significant decision involving the amended definitions in RFRA was *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751 (2014). *Hobby Lobby* addressed several small family owned businesses' religious objections to a component of the Affordable Care Act that required employers to

provide contraception as part of an employee health plan. *Id. at* 2775. The Supreme Court ultimately held that the regulations substantially burdened the corporations' free exercise of their religion by requiring them to pay for contraception. *Id.* Finally, the Court held that HHS had failed to use the least restrictive means to advance its interest and therefore had violated the RFRA. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2767 (2014).

Religious rights are protected under RFRA beyond any prior effort by the Supreme Court to define or restrict them. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014). "By enacting RFRA, Congress went far beyond what this Court has held is constitutionally required." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2767 (2014).

In *Hobby Lobby,* the Court responded to the dissent in dicta by suggesting how the RFRA might apply to the kind of challenge the Amish made in *United States v. Lee. See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2784 (2014). The Court speculated that the answer would be the same under the RFRA because there simply is no less restrictive alternative to the categorical requirement to pay taxes. *Id.* Because of the enormous variety of government expenditures funded by tax dollars, allowing taxpayers to withhold a portion of their tax obligations on religious grounds would lead to chaos. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2784 (2014). The logic of *Lee* and endorsed in *Hobby Lobby* unquestionably applies with great force to Social Security and national defense but has no persuasive weight in regards to abortion.

There are two key elements of Mr. Bowman's claim that allow it to be actionable under the RFRA despite *Lee* and the dicta in *Hobby Lobby*. First, Mr. Bowman has always told the government he will pay any tax due and owing as soon as he can be assured that none of it is used to eliminate unborn children in violation of his religious rights. He has no secular objection to anything the government might do with his taxes otherwise, nor does he believe any would be appropriate. He wishes every day that he could simply pay and be done with this. Second, abortion, as a function of government, for the purposes of the RFRA, is entirely different from Social Security or the National Defense or anything else the government uses taxes for in terms of the weight of the government's interest relative to the burden on Mr. Bowman's religious rights under the RFRA, rights which are greater than those guaranteed by the First Amendment.

Because of the fundamental difference between Mr. Bowman's claim under the RFRA and those of plaintiffs in *United States v. Lee*, 455 U.S. 252 (1982), decided long before the RFRA, it does not control the outcome here.

**b. Mr. Bowman's right to freely practice his religion is substantially burdened by the legal requirement that he pay for the murder of unborn children.**

James Madison emphasized the importance of free religious exercise in responding to a Virginia General Assembly proposal to institute a tax to subsidize Protestant Episcopal teachers:

> "[W]e hold it for a fundamental and undeniable truth, that Religion or the duty which we owe to our Creator and the manner of

discharging it, can be directed only by reason and conviction, not by force or violence. The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right.

James Madison, Memorial & Remonstrance Against Religious Assessments, ¶ 1 (1785)

"If there is any fixed star in our constitutional constellation, it is that no official . . . can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

In *Wooley v. Maynard*, 430 U.S. 705 (1977), the Supreme Court explained how the Free Speech Clause protects an individual's right not to express the government's preferred message. The Court has consistently recognized that laws compelling speech are "subject to exacting First Amendment scrutiny." *Riley v. Nat'l Fed'n of the Blind, Inc.*, 487 U.S. 781, 798 (1988).

Mr. Bowman believes as a Christian that all life is sacred and that an abortion is morally and spiritually equivalent to murder. There is no question under the law that a government mandate requiring Mr. Bowman to pay money that the government can use to promote the murder of unborn children is a substantial burdens his free exercise of religion. *United States v. Lee*, 455 U.S. 252, 257 (1982); *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014). It implicates his free speech rights by compelling him to pay money that is used to promote something antithetical to his religion. *W. Va. Bd. of Educ. v. Barnette*,

319 U.S. 624, 642 (1943); *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014).

Because of this impact on his religious rights, the burden then shifts to the government to prove that it has a compelling interest in making Mr. Bowman promote abortion in violation of his religion. *See* 42 USC §2000bb-1(b). If it demonstrates a compelling interest, and Mr. Bowman strongly argues there is none, then it must show that it has used the least restrictive means of furthering that interest. *Id; Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014).

### c.  Were Mr. Bowman to pay taxes it would be used to fund abortion.

The government will undoubtedly point to the numerous statutes that restrict the federal government from using tax dollars to provide abortions and claim that it therefore does not pay for abortion. *See e.g.* 42 USC § 18023; 42 USC §300.[2] But there appears to be little doubt at this point that the government does in fact pay for abortion. According to the Congressional Budget Office, the government provided $450 million dollars to Planned Parenthood, the country's largest abortion provider, in 2014-2015. *See* Congressional Budget Office Letter to House  Majority  Leader  "*Budgetary  Effects  of  Legislation  That  Would Permanently Prohibit the Availability of Federal Funds to Planned Parenthood" September 15, 2015.* That year Planned Parenthood eliminated more than 323,000

---

[2] see also https://www.speaker.gov/press-release/house-passes-hyde-amendment.

unborn children. *See Planned Parenthood Annual Report for 2014-2015* at 25.[3] Government funds are by far the organization's largest source of funds. *Id* at 28. Without that government money, there is no way it could have aborted that many children. Whether Mr. Bowman's tax money directly paid for abortions or was used to facilitate or promote abortions is immaterial under *Hobby Lobby*. For Mr. Bowman that represents a violation of his most deeply held religious values.

### d. The government does not have a compelling interest in promoting or facilitating abortions.

We know that the government does not have a compelling interest in promoting abortion because it has repeatedly said so. Section 1008 of the Title X states: ''None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning.'' *See* 42 U.S.C. 300a–6.

Since at least Ronald Reagan's presidency, the government has repeatedly made official statements disavowing any interest in supporting or promoting abortion.

> "Message of the rules regarding the status of the family: One message to the public is that family planning is separable from abortion and that the government supports, through its funding, programs that enable families to plan the number and spacing of their children, either through preventive methods of family planning or through management of infertility problems, but not through elimination of unborn children by abortion."

---

[3] Accessed at: https://www.plannedparenthood.org/uploads/filer_public/71/63/71633f42-af81-43e2-90c3-2e5fff989c91/2014-2015_ppfa_annual_report_.pdf

Rules and Regulations, Department of Health and Human Services
Public Health Service 42 CFR Part 59 *Statutory Prohibition on Use
of Appropriated Funds in Programs Where Abortion is a Method of
Family Planning; Standard of Compliance for Family Planning
Services Projects*, 53 FR 2922-01, 1988 WL 276839 (F.R.)

In 2000 the government issued more proclamations disclaiming any interest

in abortion when it promulgated new rules dealing with recipients of family grant

money through Title X of Medicaid.

"A Title X project may not promote or encourage the use of abortion
as a method of family planning through advocacy activities such as
providing speakers to debate in opposition to antiabortion speakers,
bringing legal action to liberalize statutes relating to abortion, or
producing and/or showing films that encourage or promote a
favorable attitude toward abortion as a method of family planning.

65 Federal Register 128 at 41281 (2000)

In the 2016 Code of Federal Regulations there are numerous

instances where the government makes it clear that it does not want to pay

for or promote abortion.

- 42 CFR §50.303 - General Rule Abortions and Related Medical
  Services in Federally Assisted Programs of the Public Health
  Service: "Federal financial participation is not available for the
  performance of an abortion in programs or projects to which this
  subpart applies."

- 42 CFR §441.201 - Centers for Medicare & Medicaid Services,
  HHS - Subpart E - Abortions: "This subpart implements section 402
  of Pub. L. 97–12, and subsequent laws that appropriate funds for the
  Medicaid program, including section 204 of Pub. L. 98–619. All of
  these laws prohibit the use of Federal funds to pay for abortions

except when continuation of the pregnancy would endanger the mother's life."

- 42 CFR §457.475 - Limitations on coverage: Abortions. "(a) General rule. FFP under title XXI is not available in expenditures for an abortion, or in expenditures for the purchase of health benefits coverage that includes coverage of abortion services unless the abortion services meet the conditions specified in paragraph (b) of this section."

- 48 CFR §352.270-13 - Health and Human Services - Continued Ban on Funding Abortion and Continued Ban on Funding of Human Embryo Research.

- 45 CFR §156.280(d) - Segregation of funds for abortion services - Abortion services — (1) Abortions for which public funding is prohibited…"

A search for the term "abortion" on the U.S. Government Publishing Office (GPO) website limited to Congressional bills and member statements returns more than 23,000 hits.[4] A survey of those search results reveals none that represent a statement of the government expressing an interest in paying for or promoting abortion. Nearly every official statement is an effort to limit government involvement in abortion.

Common sense suggests that the government has no business promoting or funding abortion in violation of the religious rights of millions. While Mr. Bowman does not dispute that the government could undoubtedly claim an interest

---

[4] Accessed at:
https://www.gpo.gov/fdsys/search/search.action?na=__governmentauthornav&se=__Congressfalse&sm=governmentauthornav&flr=&ercode=&dateBrowse=&govAuthBrowse=&collection=&historical=false&st=abortion&psh=&sbh=&tfh=&originalSearch=abortion&fromState=&sb=dno&ps=10&sb=dno&ps=10

in funding family planning generally and in supporting families, it is impossible to see how that interest specifically extends to eliminating unborn children.

Despite the government's denials it nevertheless facilitates and ultimately pays for abortion through approximately $450 million in taxpayer money given to Planned Parenthood last year. The organization then used that money to eliminate more than 300,000 unborn children. If the government has any legitimate interest in that, Mr. Bowman is utterly unable to see it.

> **e.  The government cannot sustain its burden of showing it has used the least restrictive means to further whatever interest it has in promoting and funding abortion.**

Both *Hobby Lobby* in dicta and *United States v. Lee* suggest that the general right of the government to collect taxes trump any religious objection. Those statements are simply inconsistent with the plain language of the RFRA. Mr. Bowman's challenge is fundamentally different from the plaintiffs in *Lee* or any of the litigants that challenged the federal government's war authority by withholding taxes.

*Lee*, of course, famously dealt with the Amish who wanted to be exempted from Social Security taxes. *United States v. Lee*, 455 U.S. 252, 260 (1982). "Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax." *Id*. To the extent that such a statement has continuing viability after the RFRA, it only extends to something like Social Security where

there is clearly a compelling interest and no other way to promote that interest other than the collection of taxes from every taxpayer.

Social Security is a $916 billion federal government budget item for 2015. That represents one quarter of the entire federal budget. It is difficult to identify, other than national defense, any more core function of our federal government than to provide a safety net for tens of millions of elderly Americans who paid into the system for their entire working lives. Even if you have a religious objection to Social Security, it is going to benefit you and your community.

Objecting to paying Social Security tax given its scope and its societal importance would clearly lead to "chaos." The government to would be unable to meet fundamental obligations to its citizens that have been a key part of our social contract and a core government function for more than 70 years. Obviously, Social Security taxes, as Justice Alito speculated in *Hobby Lobby,* would pass muster under a least restrictive means test.

Similarly, there is a large body of caselaw rejecting claims by antiwar activists or pacifists or others who for religious reasons object to paying taxes to support national defense. *See e.g. Autenrieth v. Cullen*, 418 F.2d 586, 588–89 (9th Cir. 1969); *Bradley v. United States*, 817 F.2d 1400, 1403 (9th Cir. 1987). 16% of the entire federal budget is dedicated to national defense spending. In 2016, that was $601 billion. Just like Social Security, national defense is fundamental to the very existence and purpose of the federal government. Article I, Sec. 8 of the Constitution expressly provides that Congress shall have the power to "to lay and

collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States;…" U.S. Const. art. I, § 8, cl. 1. If the founders intended to exempt someone from that requirement on religious grounds, they would have said so.

Like Social Security, the national defense is crucial to the ongoing welfare of all Americans. Even if one objects to it on religious grounds, one is still benefiting. Without a national defense there would be no freedom of religion to protect. It is an existential aspect of our federal government.  Here too there can be little doubt that it would meet a least restrictive means test. The government must have a generally applied tax system to have a meaningful national defense.

Abortion, however, is on very different footing. As noted above, the government has made very clear that it does not want to pay for abortion. The thousands of statements from Congress and the laws it has passed strongly indicate that abortion is not an appropriate function of the federal government except in the rare situation where it is necessary to protect the mother's health. It appears that other than taxpayer money that allows Planned Parenthood to be the biggest abortion provider in the country and some Medicaid reimbursements under Title X, the government does not directly fund abortion.

Based on the Congressional Budget Office estimate cited above, Planned Parenthood receives $450 million dollars from the federal government. Therefore abortion and its limited funding through the federal government is qualitatively and quantitatively different from national defense and Social Security for the

purposes of this Court's analysis under the RFRA. A $450 million budget line item that allows a political point to be made is a tear drop in an ocean when compared to $916 billion for Social Security and $601 billion for National Defense. There is no breakdown in society that will occur when the federal government stops facilitating abortion. And that is why Mr. Bowman's claim prevails under the RFRA's least restrictive means test.

There is simply no argument that the federal government cannot exist without funding Planned Parenthood. Unlike Social Security or national defense, the government could easily accommodate Mr. Bowman and the millions of other Christians whose religious rights under the RFRA are being violated every day by being forced to pay to support abortion.

Although the exact number of individuals subject to income tax is unclear, it appears that best estimates put that number at more than 100 million people. That means that Planned Parenthood represents about $4.50 per taxpayer in any given year. There is absolutely no reason why that could not be an optional donation left to the conscience of the individual rather than a mandatory payment that violates Mr. Bowman's religious rights under the RFRA. The federal government would continue to exist without funding Planned Parenthood and it would have no impact on a woman's right to choose to terminate her pregnancy. The only impact would be on Mr. Bowman, would could finally pay his income taxes without destroying his conscience.

The idea that this would open income taxes to all kinds of challenges under the RFRA is both immaterial and wrong. Congress knew what it was saying when it drafted the RFRA. If it wanted to exempt Title 26, it knew exactly how to do that. It did not, which makes Mr. Bowman's motion tenable. Abortion is also unique as a function of government. If there are an infinite number of such examples of funding by government that would offend religious rights in same way as abortion, it is difficult to come up with a single example that would not otherwise satisfy the least restrictive means test. Even a secularist has a hard time justifying the government paying for abortion when it is antithetical to the faith of so many Christians and does not appear to have any particular relationship to the federal government's enumerated powers.

## 3.  Conclusion:

While a woman may unequivocally have a right to choose an abortion, why does Michael Bowman have to pay for it? Mr. Bowman has been asking for 20 years for the government to accommodate his religious rights. Since 2000 it has been obligated to do exactly that under the RFRA and yet he has been ignored and persecuted for his beliefs. He has been ruined financially. He lost yet another job opportunity when his arrest in this criminal tax case was discovered.

This case does not involve Mr. Bowman's obligation to generally pay income taxes which he has always acknowledged. Nor does Mr. Bowman contest his obligation to pay Social Security taxes. He fully accepts and wants to pay taxes to support national defense. His stand has always been about his right to freely

practice his religion as guaranteed by the Constitution and RFRA and obvious fact that the federal government should not be in the business of abortion. The government under the plain language of the RFRA must accommodate him by excusing him, and the millions of others who find it religiously objectionable and morally offensive, from paying for abortion, an activity which has nothing to do with the health or welfare of the country.

Instead of accommodating concerning the tiny portion of his tax funds that are being used to fund abortion, it wants to put him in federal prison for remaining true to his religious convictions. When he asked for an accommodation they laughed at him and mocked his religion. This is exactly what the RFRA was intended to prevent: the government substantially burdening someone's religion for no reason and then threatening them with prison because they refuse to yield their principles. Because the government failed to comply with the RFRA, the indictment should be dismissed.

Respectfully submitted on February 12, 2018.

*s/Matthew Schindler*
Matthew A. Schindler, OSB#964190
Attorney for Michael Bowman